

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-17-2004

# Scott v. Local 97-B Graphic

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2005

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Scott v. Local 97-B Graphic" (2004). *2004 Decisions.* Paper 930.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/930

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-2005

ROBIN SCOTT

Appellant,

v.

GRAPHIC COMMUNICATIONS INTERNATIONAL UNION, LOCAL 97-B;
GEORGE HILL, Individually and as President of Graphic Communications International
Union, Local 97-B; GRAPHIC COMMUNICATIONS INTERNATIONAL UNION

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(D.C. Civil No. 02-cv-00806)

District Judge: The Honorable John E. Jones, III

ARGUED JANUARY 27, 2004

Before: NYGAARD and FUENTES, Circuit Judges
O'NEILL*, District Judge

(Filed : March 17, 2004)

---

*Honorable Thomas N. O'Neill, Jr., United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.

Cynthia L. Pollick, Esq. (Argued)
126 S. Main Street, Suite 201
Pittston, PA 18640
                    Counsel for Appellant

Robert D. Mariani, Esq. (Argued)
Richardson T. Eagen, Esq.
Robert D. Mariani, P.C.
P.O. Box 230
108 N. Washington Avenue
Scranton, PA 18501-0230
                    Counsel for Appellee Graphic Comm. Int'l Union, Local 97B, et al.

Peter J. Leff, Esq. (Argued)
Martin R. Ganzglass
O'Donnell, Schwartz & Anderson, P.C.
1300 L Street, N.W., Suite 1200
Washington, D.C. 20005

Stephen C. Richman
Markowitz & Richman
121 S. Broad Street
1100 North American Building
Philadelphia, PA 19107

                    Counsel for Appellee Graphic Comm. Int'l Union, AFL-CIO, CLC

_____

OPINION OF THE COURT
_____

O'NEILL, District Judge

## I.

On May 10, 2002, appellant Robin Scott filed an eleven count complaint against

her union, appellee Graphic Communications International Union, Local 97-B (Local 97-

B), the former President of Local 97-B, appellee George Hill and appellee Graphic Communications International Union, AFL-CIO, CLC (GCIU). She alleged discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, et seq., and the Pennsylvania Human Relations Act (PHRA) and asserted a claim for breach of the duty of fair representation arising from Local 97-B's failure to file grievances against her employer, Eureka Security Printing Company, Inc. Local 97-B and Eureka had entered into a collective bargaining agreement covering the terms and conditions of employment of several Eureka employees including Scott on October 1, 1998.

Scott alleges that the discrimination and harassment began in or around August 2000 after she became pregnant and requested medical/pregnancy leave. She spoke with her foreman Butch Hendrickson, a member of Local 97-B, about her request and was directed to speak with Ronald Tully, the president of Eureka. She alleges she was thereafter advised that Eureka would not grant leave pursuant to the collective bargaining agreement and company policies. Scott then approached Karen Smargiassi, Union Steward for Local 97-B, about filing a grievance. Smargiassi informed her she needed a doctor's excuse before a grievance could be filed. Scott subsequently filed a grievance on September 12, 2000. On September 14, she alleges, Smargiassi called her and threatened that she would file a grievance against Scott if Scott failed to take Smargiassi's name off the grievance. Scott refused to change her grievance.

Scott alleges she was contacted by Hill on September 15, 2000 and informed that

3

he would not hand in her grievance. She alleges he claimed not to like what she had written in her grievance and that he told her "if you could not afford children, then you should not have any." Scott then alleges her baby went into distress on September 17, 2000, due to the stress caused by the Union's conduct. She asserts that she subsequently filed additional grievances, but because she filed discrimination and harassment charges with the PHRC and the EEOC[1] the Union has not followed up on them.

Appellees filed motions to dismiss or for summary judgment on June 7, 2002, June 11, 2002 and June 14, 2002. On June 26, 2002, Scott filed separate briefs in opposition to the motions by GCIU, Local 97-B and Hill. Scott's attorney filed an affidavit in conjunction with her opposition briefs stating that "[n]o discovery has taken place since this Court has had jurisdiction over this matter" and that "this Court has not issued a Joint Case Management Order outlining discovery deadlines." The affidavit also stated "I believe discovery, including the depositions of GCIU representatives, will provide justification for the denial of GCIU's Motion for summary judgment." The affidavit did not explain why discovery had not been taken and included no elaboration on what information Scott hoped to uncover through discovery.

On May 15, 2002, before the appellees' motions were filed, Judge Caputo sent the parties a letter indicating his intent to schedule a case management conference. However, there was no follow up to his letter and the parties never met with him. The case was then

---

[1] Scott filed a charge of discrimination and complaint against GCIU and Local 97-B with the Equal Employment Opportunity Commission (EEOC) and the Pennsylvania Human Relations Commission (PHRC) on or about October 31, 2001.

4

transferred to Judge Jones on September 18, 2002. There is no evidence he arranged a joint case management conference with the parties.

On March 10, 2003, the district court issued a Memorandum and Order granting the motions for summary judgment. Scott timely filed a notice of appeal on April 9, 2003.

Appellant raises three issues on appeal: 1) whether the district court abused its discretion when it denied her request to delay its ruling on appellees' motions for summary judgment; 2) whether the district court abused its discretion when it treated appellees' "Motions to Dismiss Plaintiff's Complaint Or For Summary Judgment" as motions for summary judgment; and 3) whether the district court properly granted summary judgment to appellees on Scott's discrimination, harassment, retaliation and breach of duty of fair representation claims. We will affirm the district court's grant of summary judgment.

## II.

We review the district court's refusal to delay action for an abuse of discretion. St. Surin v. Virgin Islands Daily News, Inc., 21 F.3d 1309, 1313 (3d Cir. 1994); Radich v. Goode, 886 F.2d 1391, 1393 (3d Cir. 1989).

Review of the district court's decision to grant summary judgment is plenary. Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386 (3d Cir. 1998); Hilfirty v. Shipman, 91 F.3d 573, 577 (3d Cir. 1996); Olson v. General Electric Astrospace, 101 F.3d 947, 951 (3d Cir. 1996). In our review of the district court's decision to grant

5

summary judgment, we must apply the standard used by the district court. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996); Spangle v. Valley Forge Sewer Auth., 839 F.2d 171, 173 (3d Cir. 1988). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. See also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

An issue is "material" only if the dispute over facts "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the record taken as a whole in a light most favorable to the nonmoving party "could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986) (citation omitted).

**III.**

The district court did not abuse its discretion when it denied appellant's request to delay its ruling on appellees' motions for summary judgment. Federal Rule of Civil Procedure 56(f) gives a district court *discretion* to delay action on a motion for summary judgment "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Rule 56(f) "specifies the procedure to be followed and explicitly provides

6

that the party must file an affidavit setting forth why time is needed." Pastore v. Bell Telephone Co., 24 F3d 508, 510-11 (3d Cir. 1994). A series of our decisions has established that where a party seeks to avoid the entry of summary judgment under Rule 56(f), he/she must move beyond mere generalities and specify what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained. See Pastore, 24 F.3d at 511; Lunderstadt v. Colafella, 885 F.2d 66 (3d Cir. 1989); Dowling v. City of Philadelphia, 855 F.2d 136, 139-40 (3d Cir. 1988).

The district court found Scott's affidavit did not justify a stay of decision on summary judgment because it "provides no information as to the particular information sought, how it would preclude summary judgment and why it has not been previously obtained." Scott v. Graphic Comm. Int'l Union, et al., No. 02-00806 at 10-11 (M.D. Pa. Mar. 10, 2003). See also, Pastore, 24 F.3d at 511, quoting Dowling, 855 F.2d at 140 (outlining the information required in a Rule 56(f) affidavit). Scott asserts that, contrary to the district court's conclusion, her affidavit was sufficient to justify postponing the summary judgment decision because she had not yet had an adequate opportunity to conduct discovery. We disagree.

St. Surin v. Virgin Islands Daily News, 21 F.3d 1309, 1314 (3d Cir. 1994) and Sames v. Gable, 732 F.2d 49 (3d Cir. 1984), on which the appellant relies to support her contention that the district court erred in granting summary judgment before she could conduct discovery, are distinguishable. In St. Surin, we held summary judgment was improper while a Rule 56(f) motion was pending where the motion identified "two

7

specific depositions that had not yet been taken" and where "St. Surin had no other method of securing the evidence." 21 F.3d. at 1314. "The delay in scheduling [the two specific depositions] does appear to have resulted from St. Surin's accommodation of the Daily News and its counsel." Id. at 1315. Here, Scott's affidavit was far less specific, not identifying any specific persons to be deposed and not explaining why the information she sought had not yet been obtained. Appellants also did not actively prevent Scott from proceeding with discovery as the moving party had done in St. Surin.

In Sames, the district court denied a defense motion to limit the scope of plaintiff's discovery and did so before ruling on defendants' motion for summary judgment. 732 F.2d at 50. Before defendants responded to the interrogatories that were the subject of their unsuccessful motion to limit discovery, the district court granted summary judgment to defendants. We reversed and remanded the case holding "that it was error for the district court to grant defendants' motion for summary judgment while pertinent discovery requests were outstanding." Id. at 52. Sames was decided *before* our decisions in Dowling. Lunderstadt, and Pastore which required the parties to identify specific reasons why the court should postpone its judgment under Rule 56(f). Appellant's Rule 56(f) allegations of the additional facts that she believed discovery would uncover and that would preclude summary judgment were not sufficiently specific to meet the requirements established in Dowling. Further, unlike in Sames, there were no specific, pertinent discovery requests outstanding here as the parties had not conferred about discovery under Rule 26(f).

8

Federal Rule of Civil Procedure 26(d) provides that "a party may not seek discovery from any source before *the parties* have conferred as required by Rule 26(f)." (emphasis added). Appellant argues she was prevented from conducting discovery because neither Judge Caputo nor Judge Jones ever scheduled a joint case management meeting. Although such a meeting is required in the Middle District by Local Rule 16.1,[2] appellant was not required to wait for a conference date to be set before conferring with appellees about a discovery plan under Rule 26(f).

Under Federal Rule of Civil Procedure 26(f),

> the parties must, *as soon as practicable* and in any event *at least* 21 days before a scheduling conference is held or a scheduling order is due under Rule 16(b), confer to . . . develop a proposed discovery plan . . . . The attorneys of record . . . are jointly responsible for arranging the conference, for attempting in good faith to agree on the proposed discovery plan, and for submitting to the court within 14 days after the conference a written report outlining the plan.

(emphasis added). Rule 26(f) does not require the parties to delay conferring until after a scheduling conference has been held or a scheduling order has been issued.[3] The responsibility for arranging this conference and initiating discovery is placed squarely on the shoulders of the attorneys of record and not on the district court.

In the Middle District of Pennsylvania, Local Rule 16.3 further specifies that lead counsel for each party shall confer *at least* ten (10) days prior to the

---

[2]"Unless otherwise ordered by the court, there shall be a minimum of two (2) court conferences in every civil action: an initial case management conference and a final pretrial conference." M.D. Pa. L.R. 16.1.

[3]Federal Rule of Civil Procedure 16(b) requires the district court to issue a scheduling order only "after receiving the report from the parties under Rule 26(f) or after consulting with the attorneys for the parties . . . by a scheduling conference . . . ."

9

initial case management conference to consider the matters set forth on the court's case management form . . . and shall thereafter file a concise joint case management statement . . . . It shall be the *duty of the plaintiff* to take the initiative in holding such a conference and in assuring the completion and filing of the joint case management plan form[, which] satisfies the requirement of a proposed discovery plan under Fed.R.Civ.P. 26(f).

M.D. Pa. L.R. 16.3 (emphasis added). The local rule places the burden of ensuring the 26(f) conference takes place on the plaintiff. As with the federal rule, the local rule does not require the parties to wait for the court to schedule a case management conference before conferring about discovery matters.

"Since 1938, civil discovery has been an attorney-initiated, attorney-focused procedure. The vast majority of federal tools operate, when used properly, almost entirely without the court's involvement." Sempier v. Johnson & Higgins, 45 F.3d 724, 734 (3d Cir. 1995)(citing Fed. R. Civ. P. 26(f), requiring the parties to devise and submit a discovery plan). In this case, the parties waited for the district court to schedule a case management conference rather than taking the initiative to confer about discovery on their own as is clearly required by both Federal Rule of Civil Procedure 26(f) and Local Rule 16.3. As the district court correctly explained in a footnote, "[t]he fact that a *deadline* for the close of discovery has not yet been determined does not preclude the *initiation* of discovery by the parties." Scott, No. 02-00806 at 11 n.4 (emphasis in original).

Appellant was not foreclosed from initiating discovery in order to locate the information she needed to defend appellees' motions or from providing a specific explanation of why additional time for discovery was necessary under Rule 56(f). Given

10

the emphasis we have placed on the requirements for a proper Rule 56(f) affidavit, the district court did not abuse its discretion in following the <u>Dowling</u> line of cases in finding that appellant's affidavit was insufficient to preclude summary judgment and choosing not to grant appellant her requested delay.

## IV.

Scott argues the district court erred by not giving her notice that it was converting appellees' motions to dismiss into motions for summary judgment. We rejected this argument in <u>Hilfirty v. Shipman</u>, 91 F.3d 573 (3d Cir. 1996). In <u>Hilfirty</u>, an action for malicious prosecution brought by Hilfirty and another plaintiff, Miller, Miller argued on appeal that the lower court's decision granting summary judgment was premature and that "the District Court erred in failing to provide notice that it was treating the motions to dismiss as motions for summary judgment . . . ." <u>Id.</u> at 578. We found that Miller had adequate notice of the conversion of defendant's motions to dismiss into summary judgment motions because two of the five motions to dismiss were framed in the alternative as motions for summary judgment. We explained:

> [t]hat the two motions were framed only in the alternative as motions for summary judgment does not alter our conclusion. Miller was on notice that the Court was considering two motions for summary judgment and she had the opportunity to respond over a period of nearly eight months, between the filling of Defendants' motions to dismiss in late October 1993 and the District Court's final judgment in June of 1994.

<u>Id.</u> We held it was appropriate for the district court to treat the motions as motions for summary judgment. <u>Id.</u> at 579.

11

Scott's claim that she had no notice the district court was considering appellees'

motions to dismiss as motions for summary judgment fails under the reasoning in <u>Hilfirty</u>.

Local 97-B and Hill's motion was entitled "Motion to Dismiss or for Summary

Judgment" and GCIU's motion was entitled "Motion to Dismiss, or in the Alternative, for

Summary Judgment."[4]  Scott thus had notice that the district court might consider the

motions as motions for summary judgment.  Further, like Miller in <u>Hilfirty,</u> Scott had nine

months to respond to appellees' motions.  Between June 7, 2002 when the motions were

filed and March 10, 2003, when the district court entered final judgment, Scott did not

object to the submission of affidavits or other exhibits filed with the motions.  Scott only

submitted the inadequate 56(f) affidavit.  Because she had notice that appellees' motions

could be considered motions for summary judgment, the district court did not abuse its

discretion in ruling on the motions.

## V.

The district court's grant of summary judgment to Local 97-B and Hill was

appropriate as Scott did not identify any genuine issues of material fact with respect to her

claim that the Local Union failed to fulfill its duty of fair representation and unlawfully

discriminated against her because of her gender/pregnancy under Title VII of the Civil

Rights Act, 42 U.S.C. § 200e, <u>et seq.</u>, by failing to represent her in grievances filed

---

[4]Appellant's responses to appellee's briefs indicate she knew the motions had been framed in the alternative, as they were titled "Brief in Opposition to Defendant Graphic Communications International Union's Motion to Dismiss, or in the Alternative for Summary Judgment," and "Brief in Opposition to Defendant Local-97B's Motion to Dismiss, or in the Alternative for Summary Judgment."

against her employer. Unions are prohibited from discriminating on the basis of impermissible considerations (e.g., gender) for the same reasons as employers. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 285 (1976). A union therefore cannot discriminate in the application of the terms of its collective bargaining agreement.

Local 97-B did not discriminate against Scott. The evidence shows that Local 97-B actively pursued Scott's grievance seeking the maternity leave she was denied by Eureka. Local 97-B ultimately submitted the grievance to final and binding arbitration where it was denied. The evidence also demonstrates that Local 97-B President Hill filed a grievance on behalf of Scott against Eureka on November 16, 2000 which alleged that Scott had been laid off for filing a discrimination grievance and/or worker's compensation claim. The Local Union subsequently dropped its pursuit of the second grievance when it determined the grievance lacked merit because no employee with less seniority than Scott was retained when she was laid off. Although appellant alludes to "several other grievances" that she claims were not pursued by appellees, she has not provided evidence of these grievances and may not rest upon mere allegations in her pleading to establish that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.

Additionally, viewing the facts alleged in Scott's complaint in the light most favorable to her, any alleged harassment did not rise to the high level required to maintain a claim for a hostile work environment. Title VII is violated when the workplace is permeated with "discriminatory intimidation, ridicule and insult" that is "sufficiently

13

severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1996). The district court correctly concluded that:

> Scott's allegations [of a hostile work environment] do not reach a level of sufficient severity or pervasiveness to alter the conditions of her employment. At most Scott has alleged a few instances of unpleasant comments by co-workers. Courts before us have found that hostile and abusive work environments did not exist in cases which were seemingly far more abusive and hostile than that described by Scott.

Scott, No. 02-00806 at 14.

Finally, the district court did not err by preempting Scott's state discrimination and harassment claims against Local 97-B and Hill. "[S]tate-law claims are presumptively preempted by the NLRA when they concern conduct that is actually or arguably either protected or prohibited by the NLRA, . . . and by the LMRA when such claims rely upon an interpretation of a collective bargaining agreement." Pennsylvania Nurses Ass'n v. Pennsylvania State Educ. Ass'n, 90 F.3d 797 (3d Cir. 1996), citing Belknap, Inc. v. Hale, 463 U.S. 491, 498 (1983); and Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-06 (1988). Scott's claims derive from Local 97-B's duty of fair representation. The duty of fair representation implicates section 9(a) of the National Labor Relations Act. 29 U.S.C. § 159(a). A complaint that sounds in a duty of fair representation claim thus alleges, as the district court correctly noted, "a breach by the union [of] a duty grounded in federal statutes and . . . federal law therefore governs the cause of action." Scott, No. 02-00806 at 15, citing Vacca v. Snipes, 386 U.S. 171, 177 (1967). See also BIW

14

Deceived v. Local S6, Indus. Union of Marine and Shipbuilding Workers of Am., 132 F.3d 824, 830 (1st Cir. 1997) ("Preemption also can occur by operation of the so-called duty of fair representation"); Welch v. Gen. Motors Corp., 922 F.2d 287 (6th Cir. 1990) (holding Michigan Handicappers Civil Rights Act preempted and subsumed within the union's duty of fair representation).

Because Scott has not identified any genuine issues of material fact in her claim against Local 97-B and its former president, we will affirm the district court's grant of summary judgment in their favor.

**VI.**

The district court's grant of summary judgment to GCIU was also appropriate. GCIU could not be liable for any discriminatory and harassing conduct by Local 97-B because the Local Union was not an agent of the International Union. When determining the vicarious liability of an international union for the discriminatory actions of its local union affiliates and their officers, common law agency principles apply. See, e.g., Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212 (1979); Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1429 (D.C. Cir. 1988). A principal-agent relationship may not be inferred solely from affiliation between an international union and a local union. See, e.g., Carbon Fuel, 444 U.S. at 217; Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 304-05 (1925); United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 395 (1922). "The test to determine whether an agency relationship exists is essentially one of balancing the character of the business affairs subject to the

15

International's control and supervision against those left to the discretion of the local." Alexander v. Local 496, Laborers Int'l Union of North Am., 778 F. Supp. 1401, 1420 (N.D. Ohio 1991), citing Berrigan v. Greyhound Lines, Inc., 560 F. Supp. 165, 169 (D. Mass. 1982).

The collective bargaining agreement between Local 97-B and Eureka states that they are the only parties to the agreement, but refers to Local 97-B as "the GRAPHIC COMMUNICATIONS UNION NO. 97-B, as a subordinate union of the GRAPHIC COMMUNICATIONS INTERNATIONAL UNION." App. 219. GCIU's Constitution, notes however, that all bodies subordinate to GCIU are autonomous and self-governing. See App. 123, 192-93. Pursuant to the GCIU Constitution and Laws, local unions have complete autonomy from the International Union with respect to the administration of contracts, including the processing of grievances, decisions to proceed or not to proceed to arbitration, and enforcement of the terms of collective bargaining agreements. Id.

GCIU does not select local union officers; members of the local union elect them. App. 125. GCIU does not play a role in the decision to process a local grievance or in how the grievance is pursued. App. at 124-25. GCIU also does not police or monitor the terms of collective bargaining agreements between local unions and employers. App. 123-24. Local 97-B did submit its 1998 contract with Eureka Security Printing Company, Inc. to GCIU for approval. GCIU's Contract and Research Department reviewed the contract and GCIU's president approved it by signing the consent and approval clause on the last page of the contract. App. 122-23. This clause states

16

however, that GCIU's approval of the contract does not make it a party to the collective bargaining agreement or make it liable for breach of the contract. App. 123. Because Scott has not demonstrated that GCIU controlled, was involved in, or had knowledge of the daily activities of the Local Union no genuine issue of material fact exists as to whether there was an agency relationship between GCIU and Local 97-B.

Scott further asserts that GCIU engaged in discriminatory conduct itself, alleging GCIU knew of Local 97-B and Hill's discrimination, harassment and retaliation and discriminated against her by failing to rectify her complaints. However, GCIU had no knowledge of any of Local 97-B's alleged conduct until Scott filed administrative charges against it with the EEOC and PHRC in October 2001. GCIU had no duty to intervene once it became aware of the conduct through the filing of the administrative charges. It did not authorize and ratify the allegedly improper conduct by failing to intervene. We have held that "[m]ere constructive knowledge of possible illegal activity on the local level is not sufficient to impose a legal duty to intervene on the International Union." Brenner v. Local. 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1289 (3d Cir. 1991). "In the face of Congress' clear statement of the limits of an international union's legal responsibility for the acts of one of its local unions, it would be anomalous to hold that an international is nonetheless liable for its failure to take certain steps in response to actions of the local." Id., citing Carbon Fuel, 444 U.S. at 217-18. Scott has provided no evidence that demonstrates GCIU controlled, authorized, or otherwise ratified the acts of Local 97-B or Hill. She merely alleges that GCIU failed to

17

do anything.  Under <u>Brenner</u>, the allegation that GCIU did nothing despite its knowledge of Local 97-B's alleged discrimination and harassment is insufficient to state a claim against the International Union.  The district court's grant of summary judgment to GCIU was therefore also appropriate.